v. Stilwell v. Samian Good afternoon, Your Honors. May it please the Court. My name is David Stilwell, on appointment under the Criminal Justice Act. By all acknowledgment, including the government and the District Court below, Mr. Stilwell is, in the District Court's words and in its decision, situated differently. That is to say, crediting the arguments made with regard to a motion to dismiss, which in our position should have been granted at the close of the government's evidence, the District Court correctly noted the weaknesses that we point out in all of the evidence presented by the government and justified by the government in support of sustaining this jury's verdict. The only argument on appeal is essentially one that boils down to the following. If all of that evidence taken in isolation is weak, just aggregating it together really doesn't change the bottom line, which is that it was a weak case against Mr. Stilwell. And understand that the whole case depends on a single count and a single element, meaning, could the government sustain its burden of proof before a rational jury beyond a reasonable doubt that Mr. Stilwell knew before he boarded that airplane bound for the Philippines that the purpose of the conspiracy was to commit murder in a foreign country? And that jurisdictional element, again, is one that ultimately, in summation and in argument, the government seeks to justify and sustain based upon what Mr. Stilwell must have known as the result of his relationship with a co-defendant, Adam Samia, and they proximity and a relationship, just take a look, the best evidence of what the government's argument was would be the summation in the district court. And the summation was replete with instances during the course of the presentation following trial to the effect that, you know, exercise your common sense, ladies and gentlemen of the jury, the relationship between these two leads to a conclusion that Mr. Samia must have shared the purpose of the conspiracy in the United States before the two of them left for the Philippines. We have to look at the record in the light most favorable to the jury's verdict, right? Absolutely. And we have a very tough burden, as Jackson v. Virginia makes clear. So we're not arguing about that. We understand the burden. We also understand that, at least on this sufficiency point, you did not dispute that the jury could have found that your client was involved in a murder in the Philippines, right? Well, sure. We, in effect, conceded an opening statement that was the case. What he does when he goes to the Philippines is he kills someone. The question is whether that murder plan arose only after he left the United States or whether it was his intent when he was still in this country, right? I don't think there's any question that the evidence suggests that the plan arose. The question is whether Mr. Stilwell knew about it before he left the United States. Well, I mean, let me suggest to you that the evidence you have to address for us is that he'd never traveled out of the country before, and so his first trip is to the Philippines, where he commits a murder. He does it in the company of someone who acknowledges that that was his purpose in going and who is the individual who arranges for your client's passport and travel plans. Before leaving this country, your client goes up on the computer and accesses websites that have to do with murder, and he acquires various items, including a shoulder holster for a gun, that would be consistent with a murder plan. We'll just stop there for the moment. Why would a jury not be able to infer from the totality of those circumstances that, yes, the man's intent when he left the  an individual who committed a conspiracy to murder. Well, taking them again, and you have to go through them one at a time, and it'll take a little time to do this. Right. So in the end, I mean, we have to talk about them individually. Right. But in the end, the jury gets to consider them in as in, you know, in their totality. Maybe I can be helpful. I think it's the difference between trying to understand this in the context of what would usually be the case on a sufficiency appeal involving conspiracy, where you're dealing with general intent, and to distinguish that, the most important point, I think, in our brief between that case and this case, which is that it ultimately boils down to a specific intent case. All of those inferences that your Honor talks about may well be the sort of thing in which a jury in every day in every courtroom in America can deal with ambiguous evidence and trying to understand and put it all together in order to infer whether or not the defendant is a lawbreaker and whether he crossed over the line. That's an entirely different case, though. Those generalized conspiracy principles don't really work, a point we made from the outset of this case, when you're dealing with having to prove the specific intent that the defendant knew that the purpose of the conspiracy was to commit murder in a foreign country. Well, I think it's really just a matter of when he joined the conspiracy. There's no question that the conspiracy was one to commit murder. So did he join it while he was still in the United States, which the government had to prove? Correct. Or did he join it only afterwards? So that's that — I'm not sure that's any different standard. It's just a temporal question. Well, it's a temporal one, but an important one because we offered a plausible alternative. This is not a case where it's just one of those hypothetical possibilities, and we understand the burden here that we're not — it's not enough for us to just show that hypothetically there's an alternative hypothesis of innocence. But this is a case where we actually have co-conspirators who testified in the government's case as a result of cooperation agreements, and one of them, Tim Van Vakias, made quite clear that he was lured to the Philippines thinking that it was security work and only found out what truly it was about once he got there. So we're not talking about a hypothetical possibility that they might not have told him until he arrived in the Philippines. It actually happened in this case. But your client had other evidence, as I said, his — and I know you have explanations for it, but the jury could look at the website activity and the purchase of some of the equipment as putting him in a different situation. As I mentioned, Your Honor, I see that my time is up. If I could just respond to that. You know, with regard to — it's not website activity. It's actually what's on his hard drive on his laptop. And — but that's not materially important. What is important is that the most that can be said of that evidence, as the district court quite properly pointed out, is that it's not clear how far you can take access. It's not clear, for example, that access could be deemed the same thing as he opened the files and read them. And given the fact that there were over 16,500 files on his computer in this interesting stuff folder, I think the most that can be said for that evidence, unless you combine it with other things, is it just simply is not able to sustain the government's burden of proof to prove that the intent of this was to commit murder in a foreign country. I think that's the first thing. And with regard to the shoulder holster and the hats and the tactical gear, remember, Your Honor, that this defendant was in the firearms business. He made holsters for a living. It's not inconceivable. Again, an alternative hypothesis of innocence, but it's not, you know, in a vacuum. This is actually the facts of this case. It's not implausible to have concluded that that's equally one that a jury could infer that it was innocent. And ultimately, at the end of the day, what does that add up to? It adds up to, at most, that the defendant, a jury, could properly find that he was probably guilty. And that's not enough. It's an element of the offense. If they can't find that element of the offense beyond a reasonable doubt, even in totality, and if you parse all of them together and say they're all weak, but somehow or another, magically, even all of them weak, adding up to something that the jury could find beyond a reasonable doubt, we submit that that's contrary to law in other circuits and contrary to the Kaplan case in this circuit. That's the equivalent of saying, again, that the defendant must be guilty because he must have known as a result of information shared by Mr. Samea. And that's where it has to come from because he doesn't have any contact with anybody else in the conspiracy. Thank you. I've reserved the balance of my time. May it please the court. Masha Hansford for appellant Adam Samea. Six witnesses saw the man who killed the victim in this case. And they gave descriptions, statements of identification and contributed to composite sketches that ruled out Mr. Samea as the killer. Everyone agrees those witnesses were sincere, but the jury never got to hear or weigh any of this evidence. Now, this body of evidence, consistent statements from six separate people, two of whom correctly identified Mr. Stilwell as the killer, was critical to Mr. Samea's claim of innocence. Its admission was required both under Rule 807 and in light of Mr. Samea's constitutional right to present a defense. Now, reversal is separately warranted because Mr. Stilwell's deeply unreliable out-of-court confession was introduced to trial in violation of Mr. Samea's brutal rights. And this case actually goes a step beyond this court's prior brutal cases because of the government's statements and opening linking Mr. Samea to the confession and its focus on the formerly unnamed other person in eliciting the confession and its closing argument. I'd like to turn first to Rule 807, but before I do, I want to reiterate that for Mr. Samea's case, the standard is not sufficiency, which is what we're hearing about for the first 10 minutes. The quality of the evidence matters. And the fact that the critical evidence for the government came from vile co-conspirators testifying pursuant to cooperation agreements is very significant. So turning to Rule 807. Significant, but why is it relevant here? Why should we why why should we find that significant that the evidence came from persons who had cooperation agreements? Your Honor, it's significant. It's significant that the evidence came from those persons in assessing the weight that the excluded evidence would have had. Of course, for the Rule 807 inquiry, the proper inquiry is just to look at the statements. And if you do that, the evidence plainly satisfies the requirements of Rule 807. The more than satisfy, you have to be able to show that the district court abused its discretion in concluding otherwise, right? Absolutely, Your Honor. Now, the district court identified a number of concerns with the evidence, both in terms of its reliability. Some of that was based on temporal concerns, some of that was based on observation concerns because the killers had masqueraded themselves or concealed their identities in some way. Why don't we have a reasonable conclusion by a district judge here? Absolutely, Your Honor. In this case, the district court made a legal error in requiring a standard of trustworthiness much higher than what is required in this case. And I want to address the specific concerns you raised, like the masquerading. But the legal standard under this court's sharing court decision is the reducing risk as to any of any two of the four categories of hearsay risk is enough. The benchmark is whether this evidence is equivalent in trustworthiness to evidence admitted under other hearsay exceptions. That is not a high standard. A statement that's an excited utterance. Really? Yes. To give you an example, Judge Raggi, a statement that's an excited utterance would be admitted if somebody makes a 911 call saying, I saw the shooter. He had curly hair. He looked like George Clooney. That evidence would be admitted even if that person only had a few moments to glimpse the evidence. And I want to talk about the evidence in this case because it was extremely powerful evidence. There was no possibility that the killers were masquerading themselves. There was not a shred of evidence for that proposition. In fact, two of the witnesses correctly identified Mr. Stilwell's photo in a photo array, disproving that theory. Two others identified someone who looked very similar to Mr. Stilwell. But all you need to reverse in this case. Record evidence of masquerading. What is the record evidence that suggested that they had disguised themselves in some way? There is no record evidence that they disguised themselves in some way. Are you saying the district judge misidentified that fact? The district judge did not identify any evidence of masquerading. The notes are in the record and I would ask the court to look at them. It's pages 150 to 155 of the joint appendix and 227 to 231. The district court's initial reasoning was that the appellants wore hats. And that is not a sound reason. That it could affect the reliability of the identification that they had been wearing hats. It could, Your Honor, but not in a way that's legally relevant. Because an excited utterance describing somebody who's wearing a hat would be admissible. It's a completely different standard. It's a completely different standard. The district court here was concerned about the opportunity of the witnesses to view and thought that there needed to be the opportunity for cross-examination on this. She was concerned about the fact that a fair amount of time had passed since the identifications. And again, she thought that that was, there was a reliability issue without the opportunity for cross-examination. Your Honor, the standard is not completely different. And I would again point to the sharing corp decision in the language of Rule 807, which just asks, are, is the statement as reliable as evidence admitted under hearsay exception? What I meant was that each hearsay exception deals with a concern and a reason why the concern is not evident. The excited utterance concern is assuaged by the fact that someone speaking in a moment of excitement is unlikely to fabricate. Fabrication is not the concern with these witnesses. As you said, no one questioned their sincerity. It's a completely different concern, which is reliability and memory. And to that extent, the excited utterance exception does not help us here. Okay, help, but help us out. Absolutely, Your Honor. So I completely agree with the first part of what you said, but I disagree with the second part. The excited utterance exception is in fact based on sincerity. The advisory committee notes as well as decisions from this court and the Supreme Court make that clear. And that, the advisory. As I said, that's what fabrication is concerned with. That's not a concern with the witnesses you're dealing with. But I would submit that the fact that there is no risk of fabrication in this case is itself a reason that this evidence had to be admitted. And I would point to the advisory committee notes for the excited utterance exception that explain that although the risk of misperception is actually higher because of the excitement and excited utterance, that is evidence is still admitted because the risk of insincerity is reduced. The risk of insincerity is the most important factor. This court's decision in Bryce makes that clear. The Seventh Circuit explains that. And Judge Radji, and the sharing court decision makes clear that risk need not to be reduced as to every category including perception. But I would like to address your concern about memory and your concern about the reliability of perception. I would submit that the sincerity and lack of risk in narration itself are enough for me. But if you disagree with me on that, I'd like to address why this was extremely reliable evidence. As to perception and memory. So on perception, these witnesses interacted with the killers for an extended period. They met in one location, traveled in separate cars to another, walked up a hill, viewed a property, were introduced directly, spoke directly to these people. This is a far more extensive interaction than is required for testimony, for hearsay and other testimony. And the witnesses got a full view of the faces of the killers. They were able to contribute to a composite sketch with a full view of the face. They were able to give specific detailed descriptions three years after the crime and five years after the crime that were consistent between the witnesses as well as within the witness. And here, critically, there are six separate people. If this were just one statement, that would be also admissible. But here there's six people who consistently, not a single person was able to identify Mr. Simia in the lineup. Two of them did identify Mr. Stilwell. And in fact, Tony, the second killer, the government alleged was Mr. Simia, the witnesses got an even better view of that person. Because first, he did not wear sunglasses. But critically, he tripped and lost his hat, revealing his curly hair, which Mr. Simia does not have, and his appearance to George Clooney, which also does not resemble Mr. Simia. So this was an extremely detailed view. These people would have been the star witnesses at trial. And the defense was desperate to get their testimony live. But because it couldn't, hearsay was the second best option. Now, on memory, Judge Raji, first, I would like to break out the sketches for this point. Because the sketches were prepared two days after the killing. There was no risk of faulty memory. If you agree with me just on the sketches, that is enough for reversal. The defense was desperate to get that evidence in. It would have made a huge difference in this case. There's no risk of memory, no risk of narration. Because separate witnesses gave descriptions, the artist converted them into a sketch, and the separate witnesses then adopted that sketch as accurately representing Mr. Simia. And the consistency that a sketch that multiple witnesses agreed on, and that doesn't resemble Mr. Simia, is powerfully corroborates itself, and powerfully corroborates the fact that the six witnesses, none of them were able to identify Mr. Simia. They said they do not recognize Tony. Tony is not in the array. So this is powerful, extremely reliable evidence. And the standard under Rule 807 is not astronomical.  The jury should have been able to consider this evidence, to hear this evidence, and to weigh it against Paul LaRue's assertion that Mr. Simia had said to a third person some horribly incriminating fact. The jury should have been able to make that determination. And- Wasn't the key to the van in which the victim was murdered found in Simia's bedroom? Yes, Your Honor. There was a key to a van, but not necessarily the van in which the victim was murdered. And let me explain that. The van was found years into the investigation under mysterious circumstances by Paul LaRue. And the- he- it turned up on one of his properties, and the van resembled a van in which the victim could have been killed because the backseats were taken out. But for mysterious reasons, the Philippine authorities would not allow the U.S. authorities to test the van to see if there was blood or DNA, and to verify that, in fact, the murder occurred there. Now, Mr. Simia, at trial, conceded that he worked for this organization. He explained that he was conducting what he believed was legitimate security work, and he ran errands, and he used their cars. And so he did have a key to a van that started, but it was not clear that the van was the one where the murder occurred. And just the- this is the kind of fact that the jury could have found incriminating, but it is so much more attenuated than the evidence that was excluded. The evidence that was excluded was eyewitness testimony from people who saw the killers on the day, who were neutral, in fact, who were friends with the victim, who wanted to find the true killer, who had no reason to lie. These were the best witnesses in this case, and they were excluded. Every single one of them was excluded. Thanks very much. Mr. Bovee. Thank you, Your Honor. May it please the Court. My name is Emil Bovee. I represent the government on appeal, and I represent the government in the proceedings below. I'd like to start on the residual clause question here. And Samia's position would turn this rule into just a vehicle for admitting huge quantities of hearsay at trials that is otherwise inadmissible under the rules. The Court's precedent is clear that Rule 807 is a narrow exception, and that, frankly, refutes this position that the sincerity of the hearsay declarant is dispositive. That's just not the law. There's also not- It cannot be dispositive of the factor weighing in favor of admissibility, isn't it? Yes, Judge, I agree with that. If they weren't, if there was a sincerity issue, you'd be arguing that to us as a reason to leave it out. We would, Judge. And I think that it's a fair starting point, and it was a fair starting point for Judge Abrams' analysis. But she did not abuse her discretion when she concluded that based on all the considerations at play here, that sincerity alone wasn't enough. And I would like to talk a little bit about what these witnesses said and what was in the record. There were some questions earlier about the evidence of masquerading and the types of things that- That was my word, and it perhaps was an unfortunate one. But go ahead. Tell us what the record shows. What the record shows is that there were, first of all, in 2015, there were two interviews with clusters of witnesses. So I don't think it's accurate to say that there are six independent witnesses who provided this information. And I'm going to use their initials, if I could, based on the Court's sealing rulings. So there's six witnesses. There's DA and his two sons who do one interview. And then there's the two real estate brokers, M.M. and J.M., as well as the real estate seller, A.S. So DA makes clear in 2015, Tony stayed with Kathy Lee, the victim, while Bill Maxwell walked around the property. So right at that point, and this was something that Judge Abrams had to consider when making this evaluation, she has reason, Judge Abrams, to question the type of look that DA and his sons got at Tony, because the witness, when first questioned about this, says this wasn't actually an extended interaction. I brought my sons and Kathy Lee to a Starbucks. These two other men were there. Lee rode with the two men to the property. I wasn't in the car. When we get to look at the property, Tony, who's, we submit, Adam Samia, stays back with the victim, and it was Bill Maxwell that follows around. So the record is that what the DA said in 2015 was that this wasn't an extended interaction. And as to his two sons, there's no evidence about the extent of the opportunity they had to view Tony or Bill Maxwell. The second interaction on the day of the murder is with M.M., J.M., and A.S. And what they said is that it's similar in that they meet Maxwell and Tony at a restaurant. They call it a mushroom burger. They said that both Tony and Bill Maxwell were pulling their hats down the entire time. And these citations I'm referring to are Special Appendix 225 and 226, but the same notes are the ones that were referred to previously at another part of the record. And again, this is a joint interview with these three people. They say, both Maxwell and Tony are pulling their hats down. Tony, I think this is a quote from the notes, mostly avoided talking with anyone. Tony did not speak and evading contact. So Judge Abrams was certainly entitled to consider those things when thinking about other markers of the reliability of this evidence and to conclude that they weighed pretty heavily against admissibility here. In 2017, during the interviews of J.M. and M.M., some more important facts emerged that further called into question the reliability of this evidence. J.M. makes additional reference to they had their caps down low. That's Sammy Appendix at 227. And I think for me that one of the key facts is J.M. starts to point out that this was the second showing of the day. It was getting dark. That's in the interview notes. And that's another thing that in addition to the caps that Judge Abrams could consider as a marker of reliability. And I think we're talking about the first element of Rule 807, equivalent circumstantial guarantees of trustworthiness and reliability. So I agree. Sincerity is conceded. But I just spent a lot of time talking about the things in the record that could quite reasonably and in fact did cause Judge Abrams to opportunity of the declarance to perceive Tony, that call into question the reliability of their identification statements in these descriptions. The memory question, I think, is serious and straightforward. They were not interviewed until 2015 regarding a 2012 murder. There were some things said today about these sketches. There was nothing put in front of Judge Abrams about the provenance of these sketches. And in Samia's reply brief, I think he basically says, well, the government produced them, so it was on them to provide this information. That's not right in the context of an admissibility determination. The burden is on the proponent of the evidence to demonstrate that it's reliable and admissible. And in this case, Samia had an opportunity to do that. His CJA counsel went to Philippines. They had contact with the Philippines Law Enforcement Agency responsible for the investigation of the murder. It would have been straightforward to ask questions about who's the sketch artist? How are these prepared? So the questions about the reliability and the authenticity of those sketches are abundant, and it wasn't an abuse of discretion to exclude those. I think today this analysis requires sort of an analogy to find some other hearsay exception that is similar that would bear on these questions in a similar way, and the one that was relied on today was the excited utterance exception. So I agree with the first point that sincerity, I think, is basically unquestioned with respect to that exception. But there's a second component of the excited utterance exception, and it relates to memory, because the person is talking about something that is happening at that time. And so that is what sets apart the excited utterance exception and makes it inapplicable and opposite when we're talking about witnesses being asked by law enforcement three years after a murder, five years after a murder, about a day in 2012, and I think importantly, a day when they had no particular reason to be focused on this any more than they would about, for example, what one had for breakfast five years ago. This was a normal, typical real estate transaction until after the fact. And under these circumstances, with the questions regarding perception, memory, and narration, and when we refer to questions about narration, what we're talking about is these notes are sparse. The record before Judge Abrams about what these witnesses would have said, if called, was limited, and so that also, I think, was a reasonable thing for her to question and to consider as she thought about why this evidence was not reliable and inadmissible, and there's not, this can't be boiled down, I don't think, to a math problem. It's not, well, we have sincerity, that's good enough. Two out of four, maybe that works also. This is necessarily a holistic determination that needs to be made by a trial judge, subject to abuse and discretion review, but one that is, that affords the judge some discretion to look at all the evidence and to think about it in the context of the case. There is also, with respect to both defendants here, ample room for harmless error analysis, and I'd like to explain why, first, by reference to this residual clause question. The two counts that are now at issue in this appeal, one is a conspiracy to commit this murder abroad, and the other is a money laundering count, and so the conspiracy required evidence of an agreement to commit that crime. Before the defendant in question left the United States. So this issue for Samia of whether or not he was there and actually shot Catherine Lee, I think there's ample evidence of that, but that's not really the precise question for analysis of the Section 956 crime. Now, with regard to the money laundering offense, it wasn't necessary for us to establish that the defendant in question actually committed the crime that constituted the SUA, the unlawful activity that generated the proceeds, and so, again, the focus for the harmless error analysis in this case is not necessarily on who pulled the trigger to murder Catherine Lee. It's whether these men joined conspiracies to do these things, and Judge Roger, you've already cataloged the substantial evidence that supports that inference with respect to Stilwell, and with respect to the points you made, the timing is also very important. The phone call that you referred to is on September 30th, 2011. Days later, on October 6th, Samia is emailing with Hunter and making plans to travel to Brazil to discuss the murder and the murder plans, and he sends an email that says, my guy here, Stilwell, is eager to work, and then it's just four days later on October 10th that Stilwell accesses the materials in this interesting stuff folder. Those were documents saved on the laptop. There was testimony from a forensic examiner explaining that Stilwell actually opened some of those documents on October 10th, so the evidence is not that there were 16,000 documents and maybe he looked at some, maybe he looked at some. There were specific documents, including one titled, how to kill someone with your bare hands, that were opened on October 10th, 2011. So that's the evidence, both from a sufficiency and a harmlessness. Thanks, Mr. Bober. I have one. Go ahead. Can I go to your other theory's confrontation clause claim? Stilwell's confessions were admitted. Yes, Judge. The only way they didn't implicate Samia was because they were redacted. But the argument, as I understand it, is that while those redactions might be enough, notwithstanding the jury may or may not be able to figure out who they refer to, was that in the opening statement of the prosecutor, without reading the whole thing, he said, But as they drove back into Manila that night, Adam Samia pulled out a .22 caliber handgun, turned around, and aimed it carefully, and shot Catherine Lee twice in the face, killing her instantly. What evidence, other than the so-called redacted confession of Stilwell, supported that? Thank you for getting to that, Judge. I was hoping to clarify this point. The evidence is the testimony of Timothy Van Bokius. And so in that opening statement, at that point, the prosecutor who gave that jury address was describing the anticipated testimony of the cooperating witness. That testimony is at 772 of the Samia appendix. And it's, for context, nine pages later in the transcript where the anticipated redacted confession is described. So it's not as if those things were described in tandem. And that was the evidentiary basis. The part of the closing that is challenged along the same lines is also referring to the testimony of Van Bokius. And I think that is at Samia appendix 929. And on that page of the transcript, I think the quotation marks are actually they made it into the transcript because there was a slide on the screen of the testimony from Van Bokius. So there's a separate, independent evidentiary basis in the record for those arguments. And I think it's also important here that Judge Radji made clear in JAS that what matters for a brutal analysis is the statement itself and the redacted statement on the four corners. And I think the pertinent part of JAS is the critical inquiry is thus not whether a jury might infer from other facts, whether evidence admitted at trial, or circumstances. And I think it's that reference to circumstances that's important here. As long as the prosecutor — I agree with that. I'm just simply suggesting that what concerned me was the language of the prosecutor, which absent the evidence that you have pointed me to and I'll look at, would seem to undermine that argument because it's the prosecutor in effect telling the jury what has been redacted. And so I think what you'll see, Judge, is that is referring to the testimony of Van Bokius and that Hunter, in conversations with LaRue, also described some of those details. And some of those details are also clear from the video recording that was made in Thailand in 2013, which is — it was Government Exhibit 104, and I think it's at our special appendix pages 4 to 6. So there are three separate evidentiary bases to be making those points, points that were not objected to during either of those jury addresses. But it's, I think, almost word for word what Van Bokius said. Including the use of the defendant's name? Yes, Judge. I have some clerical questions, as presided, just to make sure that I understand the situation. There's agreement, I believe, by the parties that with respect to counts 3 and 5, correct? Oh, no, no, sorry. Counts 1, 2, and 4 are to be vacated. Is that right? Because the indictment numbering changed between the indictments in the record and the trial, if I could do this by reference to the statutory charges, Judge. Okay, go ahead. It's the count charging a violation of Section 924J, which was count 4 in the original indictment at SAME Appendix 285. So it's that Section 924J charge, and then the two murder-for-hire charges, which were violations of Section 1958. And in the original indictment at Appendix 285, that's counts 1 and 2. Yes, so it's 1, 2, and 4. Thank you, Judge. I am a little perplexed about your view that the 924J count has to be dismissed. Now, an element of it is that you have to have a crime of violence, and for that you used the conspiracy to commit murder, which you were relying on 9243CB, or whatever it is, the B, the risk of force clause, right? That was your crime of violence. The 924. For the 924J, you have to have a crime of violence. Death has to result and a gun has to be used. Isn't that right? Yes, Judge. Okay. So the crime of violence was the conspiracy to commit murder. The Section 956. The death is the murder. Yes, Judge. Yeah. So we would, in effect, be saying, relying on Davis, that when you conspire to murder and you affect your ‑‑ you achieve your object, somehow it still doesn't fall within 924J. Is that right? I'm constrained to say yes, Judge. And that's because the conspiracy to murder has to categorically be a crime of violence no matter what they ultimately did, no matter that they ultimately murdered someone. That's the Department's position, Judge. Thank you. And then, assuming for the argument only that there's a need to remand on the theory that we affirm the judgment with respect to counts 3 and 5 for ‑‑ it would be for both appellants would then be able to, on the basis of this decision in part, make a new pitch on sentencing. That is, Judge Abrams will be able to review the matter again. In theory, under the jurisprudence of the Supreme Court, she might reimpose sentences which are identical to those she imposed before. On the other hand, she might modify it based upon the vacator of these counts, right? I think that's all accurate, Judge. Yes. I just want to make sure we understand that. Okay. Thanks. All right. Mr. Ray, you have one minute. And Ms. Hansford, two. Your Honor, just on that last point, the reason for that would be because the count that is gone is a mandatory life count. The court would have to have the discretion on remand to decide whether something short of a life sentence is appropriate. Now, I will add parenthetically that the guidelines would provide for life imprisonment, but that's not mandatory given the Booker line of authority, and the court could obviously vary from those guidelines, to answer that question. And then to Your Honor's question about ‑‑ Judge Raggi, about why this is so anomalous, and the reason is because it's murder in a foreign country over which there's no jurisdiction, unless it's a conspiracy, the part of which is in the United States, which is the whole basis of our sufficiency appeal. That's why it's an anomalous result. There's not much vague about the violence of a conspiracy to murder that achieves its object. Right. And it's because of the technical language of A, which doesn't include conspiracy, that leaves the result, and the result is an odd one. We don't have to get into how we got there. That's where we are. I do want to say in response to Mr. Bove's argument about the catalog of facts that Judge Raggi, involving sufficiency, that one of them I neglected to mention on tactical gear, there's no evidence that any of the tactical gear that was purchased was actually taken to the Philippines or used in connection with the instant offense. So it has very little evidentiary value. And the second, similarly, with regard to the forensic evidence involving the files, you know, access is a critical component of this, which the district court recognized can only be extended so far. Getting into this question about whether it was opened and viewed, I appreciate Your Honor's point. It's relevant about the temporal significance of this. But again, temporally significant as to what. What can you infer from that? And our point is you cannot infer beyond a reasonable doubt that that carries intent to commit murder in a foreign country. That's really the point. And so the value of that forensic evidence, at least under those circumstances, is limited. And then finally, I will mention one thing that was referenced by the district court in the catalog, but not by Your Honor, Judge Raggi, and that was this argument about, well, once Mr. Stilwell got to the Philippines, he was always free, if it turned out to be something other than what he thought it was, to just jump up and leave and go back to the United States. There's a number of problems with that. We touched on one of them, which is the Fifth Amendment implications of that, which it does not require, of course, the defendant to come forward with any evidence about what, you know, his reaction was. There was no proof of any reaction that he had, which distinguishes this from the cases that the government cited in its brief. And the second, I think, and more important thing is that, again, this is another  There were no cases that the government cited in its brief. Sotomayor, but we know from the verdict now having to be vacated because of 924 of the Davis opinion, that the jury found that he actually participated in the killing. So it's not a matter of, well, he just conspired and we don't know when. We know that we have a jury that thinks he participated in the murder. Understood. But, again, if the critical issue that everyone can see, including the district court, is what the defendant's intent was before he left the United States, my only point is, looking to evidence in the Philippines to try to jump that inferential leap seems to me to be of limited value precisely because, and this was consistent with the evidence, Paul Lareau testified about conspirators who were transported to the Philippines as a concrete example who didn't follow along with the conspiracy were murdered themselves, Dave Smith being one of them. So to make an argument, as the district court did in its decision, that there was ample opportunity for Mr. Stilwell to leave the conspiracy in the Philippines if it turned out to be something other than what he thought it was, really wasn't an option. And I don't think anything can be inferred from that that would be of any significance relative to the decisive and critical issue in this case, which is could you infer criminal intent in the United States that the purpose of the conspiracy was murder in a foreign country. And we're asking the court to hold on appeal that a rational jury could not do that, which is why the Rule 29 motion should have been granted in the first instance. Thank you. Thanks very much. Obviously, I've given all of you more time than originally anticipated, but we're delighted to hear you. I'll try to be efficient. Two points on Rule 807 and one point on Brewton. The government has completely recharacterized the standard under Rule 807, has elevated it far beyond this court's decision in sharing by requiring reduction of risk as to all four factors, which I submit we have here, but you don't need to determine that. And I would ask this court to look at the D.C. Circuit's decision in Slatton. And in that case, it was a clear error standard. The standard is actually harder in the D.C. Circuit. And the D.C. Circuit reversed the district court's finding that the evidence was sufficiently reliable. And, in fact, on retrial, the jury ended up convicting. It ended up rejecting the statement. But that does not mean the D.C. Circuit's decision was wrong. The standard is not whether the jury will ultimately credit the statement. Is it as reliable as other hearsay exceptions so the jury can hear them? And for an example of that, I would direct this court to the Ibanez decision, 328, Fed Appendix 673, just for an example of how low the standard is for an excited utterance to be admitted. About the record here, these are specific consistent statements. The government has no explanation for how the two witnesses were able to correctly identify Stilwell. The government has no explanation for a memory problem. As to the sketches, and this is a cold record. There was no hearing. The district court has the exact same materials that this court does. The witnesses' statements never express any limitation in an ability to observe. Their opportunity was so much better than most evidence you see. They did speak about pulling hats down and evasive conduct. But their point was that these individuals were acting suspiciously. And their notes are so detailed, so specific, years after the event, and it makes sense because as this was going on, they thought something was really awry, and they begged Ms. Lee not to get into a car with these men, and they learned the next morning she was murdered. This was a deeply memorable experience. And I think if you look at the notes, you will see that there's just no reliability problem, such that the jury should not even have had a chance to weigh the evidence. And finally, just a quick point on Bruton, picking up on Judge Corman's point, this case should be reversed under the standard doctrinal arguments. But the opening, the government's opening, linked Mr. Samia to the confession by using identical language, the turned-around-and-shot-Catherine-Lee language, both in describing the confession and in describing Mr. Samia and in describing the other person. It handed the jury the answer key to undo the redaction, and the closing also referenced specifically the person he was with in summarizing Stilwell's confession. You're right. The assistant said that there was other testimony. It wasn't the summation and the opening statements were not the be-all and end-all, that there were two people who provided the key. Absolutely, Judge Corman. And the issue is a little different as to the opening and the closing. As to the opening, I agree there was other testimony. Tim VanVakis claimed that Hunter told him in those exact words, that's what happened, and those were the exact words the government used in summarizing Stilwell's confession. So as to the opening, our objection is not that there wasn't an evidentiary basis. It's that by using those identical, that identical language, the government undid the redaction. And I would point this Court to the witness. I forget his name. VanVakis. Did the witness, is it your position that the witness used the actual, that the witness did not use the actual language that appears in the summation? No, I believe he did. And the fact that the witness who had practiced with the government had used that language, and that was the exact language the government used in summarizing Stilwell's confession in its own words, was only more incriminating. But my objection to the opening isn't the lack of evidentiary basis. It's the linking and the undoing. As to the closing. We'll reserve the decision. We're adjourned. And we're grateful to all of you, particularly for the CJA work. Thank you.